**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EVA AKINS, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>v.<br><br>HEALTHCARE SERVICES GROUP, INC.,<br><br>               Defendant. | Case No._____<br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMAND |

Plaintiff Eva Akins ("Plaintiff"), individually and on behalf of the class of similarly situated individuals (defined below), brings this action against Defendant Healthcare Services Group, Inc. ("HSG" or "Defendant"). Plaintiff makes the following allegations based upon personal knowledge as to her own actions and upon information and belief as to all other matters, and she believes that reasonable discovery will provide additional evidentiary support for the allegations herein.

## I.     NATURE OF THE CASE

1.      HSG provides environmental, dining, and nutritional support services to healthcare facilities.[1]

2.      As part of its business, Defendant obtained and stored the personal information of Plaintiff and Class Members.

3.      By taking possession and control of Plaintiff's and Class Members' personal information, Defendant assumed a duty to securely store and protect it.

4.      Defendant breached this duty and betrayed the trust of Plaintiff and Class

---

[1] *See* https://www.hcsgcorp.com/about-us/ (last visited September 2, 2025).

CLASS ACTION COMPLAINT

Members by failing to properly safeguard and protect their personal information, thus enabling cybercriminals to access, acquire, appropriate, compromise, disclose, encumber, exfiltrate, release, steal, misuse, and/or view it.

5.      On or around October 7, 2024, HSG detected suspicious activity on its computer network, indicating a data breach. Based on a subsequent investigation, HSG determined that cybercriminals infiltrated its inadequately secured computer environment and thereby gained access to its data files (the "Data Breach"). The investigation further determined that, through this infiltration, cybercriminals potentially accessed and acquired files containing the sensitive personal information of 624,496 individuals.[2]

6.      The personally identifiable information accessed by cybercriminals included names, Social Security numbers, dates of birth, financial account information, driver's license numbers, and state identification numbers (collectively, "PII").[3]

7.      Defendant's misconduct – failing to implement adequate and reasonable measures to protect Plaintiff's and Class Members' PII, failing to timely detect the Data Breach, failing to take adequate steps to prevent and stop the Data Breach, failing to disclose the material facts that it did not have adequate security practices in place to safeguard the PII, and failing to provide timely and adequate notice of the Data Breach – caused substantial harm and injuries to Plaintiff and Class Members across the United States.

8.      Due to Defendant's negligence and failures, cyber criminals obtained and now possess everything they need to commit personal identity theft and wreak havoc on the financial and personal lives of thousands of individuals, for decades to come.

---

[2] *See* HSG's breach notification letter, available at: https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9a82ac2b-5379-462d-acd6-26a3b3bd0b30.html (last visited September 2, 2025).
[3] *Id.*

CLASS ACTION COMPLAINT

9.      Plaintiff brings this class action lawsuit to hold Defendant responsible for its grossly negligent—indeed, reckless—failure to use statutorily required or reasonable industry cybersecurity measures to protect Class Members' PII.

10.     As a result of the Data Breach, Plaintiff and Class Members have already suffered damages. For example, now that their PII has been released into the criminal cyber domains, Plaintiff and Class Members are at imminent and impending risk of identity theft. This risk will continue for the rest of their lives, as Plaintiff and Class Members are now forced to deal with the danger of identity thieves possessing and using their PII.

11.     Additionally, Plaintiff and Class Members have already lost time and money responding to and mitigating the impact of the Data Breach, which efforts are continuous and ongoing.

12.     Plaintiff brings this action individually and on behalf of the Class and seeks actual damages and restitution. Plaintiff also seeks declaratory and injunctive relief, including significant improvements to Defendant's data security systems and protocols, future annual audits, Defendant-funded long-term credit monitoring services, and other remedies as the Court sees necessary and proper.

## II.     <u>JURISDICTION AND VENUE</u>

13.     This Court has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 Class Members, and one or more members of the Class are residents of a different state than the Defendant. The Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Defendant because it is headquartered in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), as Defendant resides, transacts business, committed an illegal or tortious act, has an agent, and/or can be found in this District.

### III.     PARTIES

16.     Plaintiff Eva Akins is a resident of Perry, Florida and is a former customer of HSG. Ms. Akins received a letter HSG informing her that her PII was accessed without authorization in the Data Breach.

17.     Defendant, HSG, is a Pennsylvania corporation headquartered in this District in Bensalem, Pennsylvania. Upon information and belief, Defendant collects and maintains the PII of millions of U.S. consumers.

18.     Defendant's unlawful conduct was authorized, ordered, or performed by its directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Defendant's affairs.

### IV.     FACTUAL ALLEGATIONS

**A.     The Data Breach**

19.     On or around October 7, 2024, HSG detected suspicious activity on its computer network, indicating a data breach. Based on a subsequent investigation, HSG determined that cybercriminals infiltrated its inadequately secured computer environment and thereby gained access to its data files. The investigation further determined that, through this infiltration,

CLASS ACTION COMPLAINT

cybercriminals potentially accessed and acquired files containing the sensitive PII of 624,496 individuals.[4]

20.     The PII accessed by cybercriminals included names, Social Security numbers, dates of birth, financial account information, driver's license numbers, and state identification numbers.[5]

21.     Despite the sensitivity of the PII that was exposed, and the attendant consequences to affected individuals as a result of the exposure, Defendant failed to disclose the Data Breach for several months from the time of the Breach. This inexplicable delay further exacerbated the harms to Plaintiff and Class Members.

22.     Based on the notice letter received by Plaintiff, the type of cyberattack involved, and public news reports, it is plausible and likely that Plaintiff's PII was stolen in the Data Breach.

23.     Upon information and belief, the unauthorized third-party cybercriminal gained access to the PII, exfiltrated the PII from Defendant's network, and has engaged in (and will continue to engage in) misuse of the PII, including marketing and selling Plaintiff's and Class Members' PII on the dark web.

24.     Accordingly, Defendant had obligations created by industry standards, common law, statutory law, and its own assurances and representations to keep Plaintiff and Class Members' PII confidential and to protect such PII from unauthorized access.

25.     Nevertheless, Defendant failed to spend sufficient resources on encrypting sensitive personal data, preventing external access, detecting outside infiltration, and training its employees to identify hacking threats and defend against them.

---

[4] *Id.*
[5] *Id.*

CLASS ACTION COMPLAINT

26.     The stolen PII at issue has great value to the hackers, due to the large number of individuals affected and the fact the sensitive information that was part of the data that was compromised.

**B.     Plaintiff Eva Akin's Experience**

27.     Plaintiff Eva Akins is a former customer of HSG.

28.     As a condition of receiving products and services from HSG, Ms. Akins provided her PII to Defendant, which Defendant then stored and maintained.

29.     Ms. Akins places significant value on the security of her PII. She entrusted her sensitive PII to HSG with the understanding that HSG would keep her information secure and employ reasonable and adequate security measures to ensure that it would not be compromised.

30.     Additionally, Plaintiff is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

31.     On or about August 25, 2025, Ms. Akins received a letter from HSG notifying her that her PII had been compromised.

32.     As a result of HSG's exposure of Ms. Akin's PII, she will have to spend hours attempting to mitigate the effects of the Data Breach, including monitoring financial and other important accounts for fraudulent activity.

33.     Given the highly-sensitive nature of the information that was compromised, Ms. Akins has already suffered injury and remains at a substantial and imminent risk of future harm. In addition, Ms. Akins has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

34.    Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable PII; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff's PII being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff's PII that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's PII; and (e) continued risk to Plaintiff's PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII that was entrusted to Defendant.

**C.    Defendant had an Obligation to Protect PII under the Law and the Applicable Standard of Care**

35.    The Federal Trade Commission ("FTC") has established security guidelines and recommendations to help entities protect PII and reduce the likelihood of data breaches.

36.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies like Defendant. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.

37.    In 2016, the FTC provided updated security guidelines in a publication titled *Protecting Personal Information: A Guide for Business*. Under these guidelines, companies should protect consumer information they keep; limit the sensitive consumer information they

keep; encrypt sensitive information sent to third parties or stored on computer networks; identify and understand network vulnerabilities; regularly run up-to-date anti-malware programs; and pay particular attention to the security of web applications—the software used to inform visitors to a company's website and to retrieve information from the visitors.

38.     The FTC recommends that businesses do not maintain payment card information beyond the time needed to process a transaction; restrict employee access to sensitive customer information; require strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third parties with access to sensitive information use reasonable security measures.

39.     The FTC also recommends that companies use an intrusion detection system to immediately expose a data breach; monitor incoming traffic for suspicious activity that indicates a hacker is trying to penetrate the system; monitor for the transmission of large amounts of data from the system; and develop a plan to respond effectively to a data breach in the event one occurs.

40.     The FTC has brought several actions to enforce Section 5 of the FTC Act. According to its website:

> When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights, or misled them by failing to maintain security for sensitive consumer information, or caused substantial consumer injury. In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce. In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security.[6]

---

[6] *Privacy and Security Enforcement*, Fed. Trade Comm'n, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last visited September 2, 2025).

41.     HSG was aware or should have been aware of its obligations to protect its customers' PII and privacy before and during the Data Breach yet failed to take reasonable steps to protect customers from unauthorized access. Among other violations, HSG violated its obligations under Section 5 of the FTC Act.

**D.      HSG Was on Notice of Data Threats and the Inadequacy of Its Data Security.**

42.     HSG was on notice that companies maintaining large amounts of PII during their regular course of business are prime targets for criminals looking to gain unauthorized access to sensitive and valuable information, such as the type of data at issue in this case.

43.     At all relevant times, HSG knew, or should have known, that the PII that it collected was a target for malicious actors. Despite such knowledge, and well-publicized cyberattacks on similar companies, HSG failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' PII from cyber-attacks that HSG should have anticipated and guarded against.

44.     It is well known among companies that store PII that sensitive information—such as the Social Security numbers and other PII accessed in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[7]

45.     In light of recent high profile data breaches, including Microsoft (250 million records, December 2019), T-Mobile (110 million records, August 2021), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records,

---

[7] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1    (last visited September 2, 2025).

January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), HSG knew or should have known that its electronic records would be targeted by cybercriminals.

46.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, take appropriate measures to prepare for, and are able to thwart such an attack.

### E.    The Data Breach Harmed Plaintiff and Class Members

47.    Plaintiff and Class Members have suffered and will continue to suffer harm because of the Data Breach.

48.    Plaintiff and Class Members face an imminent and substantial risk of injury of identity theft and related cyber crimes due to the Data Breach. Once data is stolen, malicious actors will either exploit the data for profit themselves or sell the data on the dark web to someone who intends to exploit the data for profit. Hackers would not incur the time and effort to steal PII—thereby risking prosecution by listing it for sale on the dark web—if the PII was not valuable to malicious actors.

49.    The dark web helps ensure users' privacy by effectively hiding server or IP details from the public. Users need special software to access the dark web. Most websites on the dark web are not directly accessible via traditional searches on common search engines and are therefore accessible only by users who know the addresses for those websites.

50.    Malicious actors use PII to gain access to Class Members' digital life, including bank accounts, social media, and credit card details. During that process, hackers can harvest other sensitive data from the victim's accounts, including personal information of family, friends, and colleagues.

51.    Consumers are injured every time their data is stolen and placed on the dark web, even if they have been victims of previous data breaches. Not only is the likelihood of identity theft increased, but the dark web is not like Google or eBay. It is comprised of multiple discrete repositories of stolen information. Each data breach puts victims at risk of having their information uploaded to different dark web databases and viewed and used by different criminal actors.

52.    HSG issued misleading public statements about the Data Breach, including its data breach notification letters,[8] in which it attempts to downplay the seriousness of the Data Breach by stating that hackers "may have accessed and copied certain files on our computer systems" when hackers have indeed exfiltrated Plaintiff's and Class Members' sensitive PII.[9]

53.    HSG's intentionally misleading public statements ignore the serious harm its security flaws caused to the Class. Worse, those statements could convince Class Members that they do not need to take steps to protect themselves.

54.    The data security community agrees that the PII compromised in the Data Breach greatly increases Class Members' risk of identity theft and fraud.

55.    As Justin Fier, Senior Vice-President for AI security company Darktrace, observed following a recent data breach at T-Mobile, "[t]here are dozens of ways that the information that was stolen could be weaponized." He added that such a massive treasure trove of consumer profiles could be of use to everyone from nation-state hackers to criminal syndicates.[10]

---

[8]    *Available at* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9a82ac2b-5379-462d-acd6-26a3b3bd0b30.html (last visited September 2, 2025).
[9] *Id.*
[10]    *See*   https://www.cnet.com/tech/services-and-software/t-mobile-gets-hacked-again-is-the-un-carrier-un-safe/ (last visited September 2, 2025).

CLASS ACTION COMPLAINT

56.    Criminals can use the PII that HSG lost to target Class Members for imposter scams, a type of fraud initiated by a person who pretends to be someone the victim can trust in order to steal sensitive data or money.[11]

57.    Criminals can also use the PII that HSG lost to commit medical identity theft.[12] These third parties can use an individual's name, Social Security number, health insurance information, or some combination thereof to see a doctor, get prescriptions, fraudulently submit claims to an individual's insurance provider, or get medical care—which could impact Plaintiff's or Class Members' ability to access their own medical care or health insurance benefits, not to mention their credit.

58.    The PII accessed in the Data Breach therefore has significant value to the hackers that have already sold or attempted to sell that information and may do so again.

59.    Malicious actors can use Class Members' PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities."

60.    As established above, the PII accessed in the Data Breach is also very valuable to HSG. HSG collects, retains, and uses this information to increase profits through predictive and other targeted marketing campaigns. HSG customers value the privacy of this information and expect HSG to allocate enough resources to ensure it is adequately protected. Customers would not have done business with HSG, provided their PII and financial information, and/or paid the

---

[11] *See* https://consumer.ftc.gov/features/imposter-scams (last visited September 2, 2025).
[12] *See* https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited September 2, 2025).

same prices for HSG's goods and services had they known HSG did not implement reasonable security measures to protect their PII.

61.    Indeed, "[f]irms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[13] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[14]  It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" or the "dark web" for many years.

62.    As a result of their real and significant value, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

63.    The PII accessed in the Data Breach is also very valuable to Plaintiff and Class Members. Consumers often exchange personal information for goods and services. For example, consumers often exchange their personal information for access to WiFi in places like airports and coffee shops. Likewise, consumers often trade their names and email addresses for special discounts (*e.g.*, sign-up coupons exchanged for email addresses). Consumers use their unique and valuable PII to access the financial sector, including when obtaining a mortgage,

---

[13] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220, Apr. 2, 2013, https://doi.org/10.1787/5k486qtxldmq-en (last visited September 2, 2025).
[14] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last visited September 2, 2025).

credit card, or business loan. As a result of the Data Breach, Plaintiff and Class Members' PII has been compromised and lost significant value.

64.     Consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[15]

65.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

66.     Plaintiff and Class Members will face a risk of injury due to the Data Breach for years to come. Malicious actors often wait months or years to use the personal information obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen personal information, meaning individuals can be the victim of several cyber crimes stemming from a single data breach. Finally, there is often significant lag time between when a person suffers harm due to theft of their PII and when they discover the harm. For example, victims rarely know that certain accounts have been opened in their name until contacted by collections agencies. Plaintiff and Class Members will therefore need to continuously monitor their accounts for years to ensure their PII obtained in the Data Breach is not used to harm them.

---

[15] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RES. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1 (last visited September 2, 2025).

67.     Even when reimbursed for money stolen due to a data breach, consumers are not made whole because the reimbursement fails to compensate for the significant time and money required to repair the impact of the fraud.

68.     Victims of identity theft also experience harm beyond economic effects. According to a 2018 study by the Identity Theft Resource Center, 32% of identity theft victims experienced negative effects at work (either with their boss or coworkers) and 8% experienced negative effects at school (either with school officials or other students).

69.     The U.S. Government Accountability Office likewise determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."

70.     Plaintiff and Class Member customers have failed to receive the value of the HSG services for which they paid and/or would have paid less had they known that HSG was failing to use reasonable security measures to secure their data.

**F.     Defendant Failed to Take Reasonable Steps to Protect its Customers' PII.**

71.     HSG requires its customers to provide a significant amount of highly personal and confidential PII to purchase its good and services. HSG collects, stores, and uses this data to maximize profits while failing to encrypt or protect it properly.

72.     HSG has legal duties to protect its customers' PII by implementing reasonable security features. This duty is further defined by federal and state guidelines and laws as well as industry norms.

73.     Defendant breached its duties by failing to implement reasonable safeguards to ensure Plaintiff's and Class Members' PII was adequately protected. As a direct and proximate

result of this breach of duty, the Data Breach occurred, and Plaintiff and Class Members were harmed. Plaintiff and Class Members did not consent to having their PII disclosed to any third-party, much less a malicious hacker who could exfiltrate it and then sell it to criminals on the dark web.

74.     Defendant could have prevented this Data Breach by properly securing and encrypting the systems containing the PII of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data, especially for individuals with whom it had not had a relationship for a period of time or for whom there was no reasonably anticipated future use.

75.     Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendant to protect and secure sensitive data they possess.

76.     Experts have identified several best practices that business like HSG should implement at a minimum, including, but not limited to: educating all employees; requiring strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

77.     Other best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

78.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 and the Center for Internet

Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

79.    The foregoing frameworks are existing and applicable industry standards, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

80.    Upon information and belief, Defendant failed to comply with one or more of the foregoing industry standards, as evidenced by the Data Breach and the unreasonable length of time between the unauthorized access to HSG's systems and HSG's discovery of that unauthorized access.

81.    The Data Breach was a reasonably foreseeable consequence of Defendant's inadequate security systems. HSG certainly has the resources to implement reasonable security systems to prevent or limit damage from data breaches. Even so, HSG failed to properly invest in its data security. Had HSG implemented reasonable data security systems and procedures (*i.e.*, followed guidelines from industry experts and state and federal governments), then it likely could have prevented hackers from infiltrating its systems and accessing its customers' PII.

82.    HSG's failure to implement reasonable security systems has caused Plaintiff and Class Members to suffer and continue to suffer harm that adversely impact Plaintiff and Class Members economically, emotionally, and/or socially. As discussed above, Plaintiff and Class Members now face a substantial, imminent, and ongoing threat of identity theft, scams, and resulting harm. These individuals now must spend significant time and money to continuously monitor their accounts and credit scores and diligently sift out phishing communications to limit potential adverse effects of the Data Breach, regardless of whether any Class Member ultimately falls victim to identity theft.

83.     In sum, Plaintiff and Class Members were injured as follows: (i) theft of their PII and the resulting loss of privacy rights in that information; (ii) improper disclosure of their PII; (iii) the lost value of unauthorized access to their PII; (iv) diminution in value of their PII; (v) the certain, imminent, and ongoing threat of fraud and identity theft, including the economic and non-economic impacts that flow therefrom; (vi) ascertainable out-of-pocket expenses and the value of their time allocated to fixing or mitigating the effects of the Data Breach; (vii) overpayments to HSG for goods and services purchased, as Plaintiff and Class Members reasonably believed a portion of the sale price would fund reasonable security measures that would protect their PII, which was not the case; and/or (viii) nominal damages.

84.     Even though HSG has decided to offer free credit monitoring for one year to its affected customers, this is insufficient to protect Plaintiff and Class Members. As discussed above, the threat of identity theft and fraud from the Data Breach will extend for many years and cost Plaintiff and the Class significant time and effort.

85.      Plaintiff and Class Members therefore have a significant and cognizable interest in obtaining injunctive and equitable relief (in addition to any monetary damages) that protects them from these long-term threats. Accordingly, this action represents the enforcement of an important right affecting the public interest and will confer a significant benefit on the general public or a large class of persons.

## V.    <u>CLASS ALLEGATIONS</u>

86.     Plaintiff brings this action on behalf of herself, and all others similarly situated pursuant to Federal Rule of Civil Procedure 23 as representative of the Class defined as follows:

> **All persons residing in the United States whose PII was compromised as a result of the Data Breach.**

87. Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

88. The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

89. Class Identity: The members of the Class are readily identifiable and ascertainable. Defendant and/or its affiliates, among others, possess the information to identify and contact Class Members.

90. Numerosity: The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Nationwide Class of approximately 624,496 individuals whose data was compromised in the Data Breach.

91. Typicality: Plaintiff's claims are typical of the claims of the members of the Class because all Class Members had their PII accessed in the Data Breach and were harmed as a result.

92. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interest antagonistic to those of the Class and is aligned with Class Members' interests because Plaintiff was subject to the same Data Breach as Class Members and faces similar threats due to the Data Breach as Class Members. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including Data Breach cases involving multiple classes.

93. Commonality and Predominance: There are questions of law and fact common to the Class. These common questions predominate over any questions affecting only individual Class Members. The common questions of law and fact include, without limitation:

a.  Whether Defendant owed Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their PII;

b.  Whether Defendant received a benefit without proper restitution, making it unjust for Defendant to retain the benefit without commensurate compensation;

c.  Whether Defendant acted negligently in connection with the monitoring and/or protection of Plaintiff's and Class Members' PII;

d.  Whether Defendant breached its duty to implement reasonable security systems to protect Plaintiff's and Class Members' PII;

e.  Whether Defendant's breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and Class Members;

f.  Whether Defendant adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

g.  When Defendant learned of the Data Breach and whether its response was adequate;

h.  Whether Plaintiff and other Class Members are entitled to credit monitoring and other injunctive relief;

i.  Whether Defendant provided timely notice of the Data Breach to Plaintiff and Class Members; and,

j.  Whether Class Members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the Data Breach.

94.     Defendant has engaged in a common course of conduct, and Class Members have been similarly impacted by Defendant's failure to maintain reasonable security procedures and practices to protect customers' PII, as well as Defendant's failure to timely alert affected customers to the Data Breach.

95.     <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all Class Members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members and risk inconsistent treatment of claims arising from the same set of facts and occurrences.

96.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VI.    CLAIMS FOR RELIEF

### COUNT I
**Negligence**
*(On Behalf of Plaintiff Class)*

97.     Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

98.     Defendant owed Plaintiff and Class Members a duty to exercise reasonable care in protecting their PII from unauthorized disclosure or access. Defendant breached its duty of care by failing to implement reasonable security procedures and practices to protect this PII. Among other things, Defendant failed to: (i) implement security systems and practices consistent with federal and state laws and guidelines; (ii) implement security systems and practices

consistent with industry norms; (iii) timely detect the Data Breach; and (iv) timely disclose the Data Breach to impacted customers.

99.    Defendant knew or should have known that Plaintiff's and Class Members' PII was highly sought after by cyber criminals and that Plaintiff and Class Members would suffer significant harm if their PII was compromised by hackers.

100.    Defendant also knew or should have known that timely detection and disclosure of the Data Breach was required and necessary to allow Plaintiff and Class Members to take appropriate actions to mitigate the resulting harm. These efforts include, but are not limited to, freezing accounts, changing passwords, monitoring credit scores/profiles and their health insurance carriers for fraudulent charges, contacting financial institutions, and cancelling or monitoring government-issued IDs such as passports and driver's licenses.

101.    Defendant had a special relationship with Plaintiff and Class Members who entrusted Defendant with several pieces of PII. Defendant's customers were required to provide PII when purchasing or attempting to purchase Defendant's products and services. Plaintiff and Class Members were led to believe Defendant would take reasonable precautions to protect their PII and would timely inform them if their PII was compromised, which Defendant failed to do.

102.    The harm that Plaintiff and Class Members suffered (and continue to suffer) was the reasonably foreseeable product of Defendant's breach of its duty of care. Defendant failed to enact reasonable security procedures and practices, and Plaintiff and Class Members were the foreseeable victims of data theft that exploited the inadequate security measures. The PII accessed in the Data Breach is precisely the type of information that cyber criminals seek and use to commit cyber crimes.

103.    But for Defendant's breach of its duty of care, the Data Breach would not have occurred and Plaintiff's and Class Members' PII would not have been accessed by an unauthorized and malicious party.

104.    As a direct and proximate result of the Defendant's negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such damages include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the compromised PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII; lost value of unauthorized access to their PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## <u>COUNT II</u>
### Negligence *Per Se*
*(On Behalf of Plaintiff and the Class)*

105.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

106.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

107.    Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

108.    Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

109.    Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

110.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

111.    As a direct and proximate result of the Defendant's negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such damages include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the compromised PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost

value of their PII; lost value of unauthorized access to their PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## COUNT III
## Unjust Enrichment
### *(On Behalf of Plaintiff and the Class)*

112.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

113.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII about them that was conferred upon, collected by, and maintained by Defendant and that was ultimately accessed in the Data Breach.

114.    Defendant was benefitted by the conferral upon it of the PII pertaining to Plaintiff and Class Members and by its ability to retain, use, and profit from that information. Defendant understood that it was in fact so benefitted.

115.    Defendant also understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

116.    But for Defendant's willingness and commitment to maintain its privacy and confidentiality, that PII would not have been transferred to and entrusted with Defendant.

117.    Defendant continues to benefit and profit from its retention and use of the PII while its value to Plaintiff and Class Members has been diminished.

118.    Defendant also benefitted through its unjust conduct by selling its services for more than those services were worth to Plaintiff and Class Members, who would not have purchased HSG's products or services had they been aware that Defendant would fail to protect their PII.

119.    Defendant also benefitted through its unjust conduct by retaining money that it should have used to provide reasonable and adequate data security to protect Plaintiff's and Class Members' PII.

120.    It is inequitable for Defendant to retain these benefits.

121.    As a result of Defendant's wrongful conduct as alleged in this Complaint (including, among things, its knowing failure to employ adequate data security measures, its continued maintenance and use of the PII belonging to Plaintiff and Class Members without having adequate data security measures, and its other conduct facilitating the theft of that PII), Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

122.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class Members' PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

123.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and Class Members in an unfair and unconscionable manner. Defendant's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

124.    The benefits conferred upon, received, and enjoyed by Defendant were not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain these benefits.

125.    Plaintiff and Class Members have no adequate remedy at law for Defendant's unjust enrichment.

Defendant is therefore liable to Plaintiff and Class Members for restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically: the value to Defendant of the PII that was compromised in the Data Breach; the profits Defendant is receiving from the use of that information; the amounts that Defendant overcharged Plaintiff and Class Members for its products and use of its services; and the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiff's and Class Members' PII.

**<u>COUNT IV</u>**
**BREACH OF FIDUCIARY DUTY**
*(On Behalf of Plaintiff and the Class)*

126.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

127.    At all relevant times hereto, Defendant owed, and owes, a fiduciary duty to Plaintiff and Class Members, including its duty to keep Plaintiff's and Class Members' PII reasonably secure.

128.    Defendant breached its fiduciary duty to Plaintiff and Class Members by failing to implement sufficient safeguards and by disclosing Plaintiff's and other Class Members' PII to unauthorized third parties.

129.    As a direct result of Defendant's breach of its fiduciary duty of confidentiality and the disclosure of Plaintiff's and Class Members' confidential PII, Plaintiff and Class Members have suffered damages.

130.    As a direct result of Defendant's breach of its fiduciary duty and the disclosure of Plaintiff's and Class Members' PII, Plaintiff and Class Members have suffered and will

continue to suffer damages, including, without limitation, (i) the untimely and/or inadequate notification of the Breach, (ii) improper disclosure of their PII, (iii) loss of privacy, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach, (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud (vi) the increased risk of identity theft, (vii) loss of the benefit of the bargain, (viii) loss of privacy, (ix) loss of confidentiality, and (x) embarrassment, emotional distress, and humiliation. At the very least, Plaintiff and the Class are entitled to nominal damages.

## COUNT V
## DECLARATORY JUDGMENT/INJUNCTIVE RELIEF
### *(On Behalf of Plaintiff and the Class)*

131.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

132.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

133.    Defendant owes duties of care to Plaintiff and Class Members that require Defendant to adequately secure their PII.

134.    Defendant still possesses Plaintiff's and Class Members' PII.

135.    Defendant does not specify in the notice of Data Breach letters what steps they have taken to prevent a data breach from occurring again.

136.    Plaintiff and Class Members are at risk of harm due to the exposure of their PII and Defendant's failure to address the security failings that lead to such exposure.

137.    Plaintiff, therefore, seeks a declaration that (1) Defendant's existing security measures do not comply with its duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and (2) to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training their security personnel regarding any new or modified procedures;

d. Segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing credit monitoring services for Plaintiff and Class Members for a period of ten years; and

h. Meaningfully educating Plaintiff and Class Members about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

(a)    That the Court determine that Plaintiff's claims are suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)    That the Court appoint Plaintiff as representative of the Class;

(c)    That Plaintiff's counsel be appointed as counsel for the Class;

(d)    That the Court award compensatory, statutory, and punitive damages;

(e)    In the alternative, that the Court award nominal damages as permitted by law;

(f)     That the Court award injunctive or other equitable relief that directs Defendant to provide Plaintiff and the Class with free identity theft protection and credit monitoring, and to implement reasonable security procedures and practices to protect customers' PII that conform to relevant federal and state guidelines and industry norms;

(g)     That the Court award reasonable costs and expenses incurred in prosecuting this action, including attorneys' fees and expert fees; and

(i)     Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues properly triable to a jury in this case.

Dated: September 3, 2025                    By:

Benjamin F. Johns
**SHUB JOHNS & HOLBROOK LLP**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
O (610) 477-8380
M (610) 585-1195
*bjohns@shublawyers.com*

Daniel Srourian, Esq.*
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Drive, Suite 200
Beverly Hills, CA 90210
Telephone: (213) 474-3800
*daniel@slfla.com*

M. Anderson Berry*
Gregory Haroutunian*
Brandon P. Jack*
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**

865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
*aberry@justice4you.com*
*gharoutunian@justice4you.com*
*bjack@justice4you.com*

*\* Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT